UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 25-3485 JGB (DTBx)** | Date | February 17, 2026 |
|---|---|---|---|
| Title | ***Doe 1, et al. v. Shirley Lai, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order (1) DENYING Defendant's Motion to Dismiss (Dkt. No. 7); and (2) VACATING the February 23, 2026, Hearing (IN CHAMBERS)**

Before the Court is a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendant Shirley Lai ("Defendant"). ("Motion," Dkt. No. 7.) The Court determines this matter is appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers filed in support of and in opposition to the Motion, the Court **DENIES** Defendant's Motion. The February 23, 2026, hearing is **VACATED**.

## I.    BACKGROUND

On October 15, 2025, Plaintiffs Doe 1 and Doe 2 filed a complaint against Defendants Shirley Lai and Jane Roe in the Superior Court of California for the County of San Bernardino. ("Complaint," Dkt. No. 1-1, Ex. 1.) The Complaint alleges 10 causes of action: (1) violation of California Civil Code § 52.5; (2) violation of California Labor Code §§ 1194, 1194.2 and 1197, and IWC Wage Order Nos. 6, 7, and 15; (3) violation of California Labor Code § 203; (4) violation of California Labor Code § 1194.2; (5) violation of California Labor Code § 226, and IWC Wage Order Nos. 6, 7, 15; (6) violation of 18 U.S.C. §§ 1584, 1595(a) for holding into involuntary servitude; (7) violation of 18 U.S.C. §§ 1589, 1595(a) for forced labor; (8) violation of 18 U.S.C. §§ 1590, 1595(a) for trafficking with respect to peonage, slavery, involuntary servitude, or forced labor; (9) violation of 18 U.S.C. §§ 1592, 1959(a) for unlawful conduct with respect to documents; and (10) violation of 18 U.S.C. §§ 1593(a), 1595(a) for benefitting financially form trafficking in persons. (See Compl.) Defendant removed the action on January 22, 2025. (Dot.

No. 1.)  On January 12, 2026, Defendant filed this Motion.[1]  (See Motion.)  Plaintiffs filed their Opposition on January 16, 2026.  ("Opposition," Dkt. No. 8.)  Defendant replied on January 27, 2026.  ("Reply," Dkt. No. 12.)

## II.    SANCTIONS

As an initial matter, Defendant's Motion appears to contain false citations and quotations.  Specifically, Defendant provides at least one false quotation that the Court can nowhere identify in the cited case, nor any other case.  Defendant also cites cases for propositions found nowhere in those cases.  Such misquotations, miscitations, and misrepresentations often indicate the presence of artificial intelligence-generated hallucinations.  It is a basic tenet of legal practice—and a rule of the State Bar of California—that a lawyer shall not "knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."  Cal. Bar Rule 3.3.  Further, under Federal Rule of Civil Procedure 11, "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [and] (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law . . . ."  Fed. R. Civ. Pro. 11.

Defendant's Counsel has not abided by either rule.  The most serious instances in the Motion are citations and legal principles attributed to:

1.  Headley v. Church of Scientology Int'l, 687 F.3d 1173, 1180 (9th Cir. 2012); and
2.  United States v. Dann, 652 F.3d 1160 (9th Cir. 2011).

Defendant quotes Headley as stating, "The fact that the plaintiffs may have been motivated by religious beliefs or subjected to disciplinary practices does not convert their service into involuntary servitude."  (Mot. at 8.)  The Court in unable to find that quotation anywhere in the opinion, or in any other opinion.  With respect to Dann, Defendant cites the case for the proposition that "lawful and truthful immigration reporting does not constitute abuse of legal process under the TVPA."  (Id. at 9.)  The Court in also unable to find that statement of law in Dann.

Undersigned counsel in the Motion is Orlando F. Cabanday.  "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. Pro. 11(c).

---

[1] The Motion is accompanied by a Request for Judicial Notice.  ("RJN," Dkt. No. 7-1.)  Because Plaintiffs do not contest the RJN, it is **GRANTED**.

**IT IS ORDERED** that Cabanday shall provide a true and accurate copy of <u>Headley v. Church of Scientology Int'l</u>, 687 F.3d 1173, 1180 (9th Cir. 2012) containing and highlighting the cited quotation no later than 12:00 p.m., Pacific Standard Time, on **February 19, 2026**.

**IT IS FURTHER ORDERED** that Cabanday shall provide a true and accurate copy of <u>United States v. Dann</u>, 652 F.3d 1160 (9th Cir. 2011) containing and highlighting all stated principles of law as cited in the Motion no later than 12:00 p.m., Pacific Standard Time, on **February 19, 2026.**

**IT IS FURTHERED ORDERED** that, if he is unable to do so, Cabanday shall file with the Court an explanation in writing how the quotation and citations were included in the Motion and why he should not be sanctioned pursuant to (1) Rule 11(b), (c); (2) 28 U.S.C. § 1927; and (3) the inherent power of the Court to order sanctions for citing non-existent quotations and legal principles to the Court no later than 12:00 p.m., Pacific Standard Time, on **February 19, 2026**.

**IT IS FURTHER ORDERED** that the written submission due on February 19, 2026, shall take the form of a sworn declaration.

**IT IS FURTHER ORDERED** that, should Cabanday have witnesses, their statements shall also be submitted in the form of a sworn declaration and filed by **February 19, 2026**.

**IT IS FURTHER ORDERED** that the Court reserves the right to call a hearing for this matter based on the evidence received.

### III.  FACTUAL ALLEGATONS

Plaintiffs allege the following facts, which are assumed to be true for the purposes of this motion.  <u>See</u> <u>Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco</u>, 277 F.3d 1114, 1120 (9th Cir. 2002).

Plaintiffs Doe 1 and Doe 2 allege that Defendant Lai, Jane Roe, Wan Yuen Buddhist Center ("First Temple"), and Hong Shin Buddhist Center ("Second Temple") acted through use of force, fraud, and coercion to subject Plaintiffs to forced labor and involuntary servitude for the benefit of Defendants.  (Compl. ¶ 1.)  Defendant Lai has been recognized as the leader, chief executive, and party in control of the First Temple and Second Temple during the relevant period.  (<u>Id.</u> ¶ 14.)  Jane Roe was the secretary to Lai and carried out her orders of verbal abuse and threats of physical violence against Plaintiffs.  (<u>Id.</u> ¶ 16.)

Doe 1 was born in Beijing and is a Chinese national.  (<u>Id.</u> ¶ 9.)  She decided to become a nun in 2012.  (<u>Id.</u> ¶ 28.)  She came the United States on a tourist visa to learn about the practice of Buddhism in the United States.  (<u>Id.</u> ¶ 9.)  During a trip in November 2019, Defendant recruited Doe 1 to become a resident Buddhist nun while visiting the First Temple, which is located in Artesia, CA.  (<u>Id.</u>)

Doe 2 was born in Sichuan and is a Chinese national.  (Id. ¶ 11.)  She became a nun in 2014.  (Id. ¶ 30.)  She first came to the United States on a tourist visa to learn about the practice of Buddhism in the United States.  (Id. ¶ 11.)  Doe 2 was also recruited by Defendant to become a Buddhist nun while visiting the First Temple.  (Id.)  Both Doe 1 and Doe 2 were told that they would have the benefit of a place to live, food to eat, and the opportunity to fully and faithfully serve the First Temple as Buddhist nuns.  (Id. ¶¶ 9, 11.)  Doe 1 was aware that the life of a Buddhist nun can be austere because she was a nun in China before she visited the United States.  (Id. ¶ 10.)  She knew that nuns are required to help clean and maintain temples, food is limited, and sleeping conditions are not as comfortable as most in the United States are used to.  (Id.)

Buddhist nuns typically wake up early and begin their days with medication and chanting, followed by a small breakfast.  (Id. ¶ 19.)  A significant portion of a nun's day is dedicated to offering services benefitting the community, including temple maintenance like cleaning ceremony halls and the monastery, and offering assistant to the sick or homeless.  (Id. ¶ 21.)  Nuns also lead meditations, give talks on religious principles, host assemblies with the public, and offer guidance to newcomers or guests.  (Id.)  While a nun's days are typically long, it would be unorthodox for a nun to consistently spend 12 or more hours a day engaged in intense temple maintenance.  (Id.)  Nuns living and working in Buddhist temples are ordinarily given full room and board, and have full freedom of movement to come and go as they please.  (Id. ¶ 22.)  They are also afforded opportunities for rest and personal time throughout the day.  (Id.)  Meals are simple but nourishing, and nuns generally cook their own food.  (Id. ¶ 23.)  Buddhist nuns are also typically given a portion of all donations received by the temple where they live and work.  (Id. ¶ 24.)

In November 2019, Plaintiffs went to stay at the First Temple.  (Id. ¶ 35.)  They stayed there until January 2021.  (Id.)  While staying at the First Temple, Plaintiffs performed typical Buddhist practices like light cleaning, chanting, and hosting monthly assemblies.  (Id.)  Plaintiffs were free to come and go as they pleased from the First Temple and performed their services freely without threats.  (Id.)  Plaintiffs did not often see Defendant Lai during this time, as she apparently lived at the Second Temple.  (Id. ¶ 36.)  While living at the First Temple, Plaintiffs were not paid but their work was within Buddhist practices.  (Id.)  They were paid $100 in cash payments after every religious assembly, which were hosted two to three times per month.  (Id.)  Plaintiffs were given lodging but not food.  (Id.)

While at the First Temple, Defendant told Plaintiffs she would help them apply for R-1 visas.  (Id. ¶ 37.)  They did not discuss fees, but Plaintiffs assumed at the time that Defendant would cover the fees because they would be working for Defendant.  (Id.)  In March 2020, however, Defendant told Plaintiffs that they each had to pay her $3,300 for the R-1 petition.  (Id.)  Plaintiffs felt like they had no choice but to pay because Defendant told them their status in the United States was based on the R-1 petition.  (Id.)

In early 2021, Defendant told Plaintiffs she was impressed with their dedication to Buddhism and invited Plaintiffs to the Second Temple.  (Id.)  Plaintiffs understood this offer to constitute the same living and working arrangement as the First Temple.  (Id.)  Defendant falsely

told Plaintiffs that they would continue doing similar tasks and would be paid $100 for each ceremony they hosted, which would occur once or twice a month at most. (Id. ¶ 38.) Both Plaintiffs were also told they would have comfortable places to sleep, sufficient food, and a small stipend at the Second Temple. (Id.) Each Plaintiff accepted the offer and moved into the Second Temple in January 2021. (Id. ¶¶ 39-40.)

Once Plaintiffs moved to the Second Temple, Defendant used Plaintiffs' allegedly pending immigration petitions and threats of deportation as leverage to control Plaintiffs. (Id. ¶ 43.) Plaintiffs were concerned because they believed they no longer had valid status in the United States because their tourist visas had expired. (Id.) Defendant told Plaintiffs they had to do precisely as she said or she would kick them out, they would lose their immigration status, and they would be deported to China. (Id.) When Plaintiffs would ask Defendant about their visa status, she would yell at Plaintiffs and threatened to expel them if they continued to ask about their status. (Id. ¶ 44.)

In April 2021, Defendant told Plaintiffs she had received notice that their R-1 visas had been approved. (Id. ¶ 45.) But Plaintiffs were never allowed to see any immigration documents. (Id. ¶ 46.) Defendant completely controlled Plaintiffs' immigration applications, paperwork, and notices, and withheld such documentation from Plaintiffs. (Id.) Plaintiffs felt compelled to continue working for Defendant because she told them their R-1 status was contingent on their continued presence at the Second Temple and that if they stopped doing as she asked, they would be deported. (Id. ¶ 47.)

While at the Second Temple, Plaintiffs were forced to work 12-17 hours per day and were given only an egg, a carton of milk, and expired food. (Id. ¶ 49.) Defendants told Plaintiffs to eat scraps from the garbage if they were hungry. (Id.) Defendants refused to provide Plaintiffs with enough toilet paper and menstrual products, forcing them to live in unsanitary conditions. (Id.) Plaintiffs could only sleep 5 to 6 hours per night. (Id.) Plaintiffs were not allowed to leave the Second Temple without permission. (Id. ¶ 50.) The temple is surrounded by walls and a locked gate, which prevented Plaintiffs from leaving even against Defendant's instructions. (Id.) Lai, Roe, and Second Temple kept the entrance locked at all times ensuring Plaintiffs could not escape. (Id.) Defendant told Plaintiffs she could see everything Plaintiffs did on surveillance cameras and she showed Plaintiffs video footage of Plaintiffs in the courtyard. (Id. ¶ 51.) Defendant told Plaintiffs that if they ever went outside without her permission, they would lose their legal status and be deported. (Id. ¶ 52.)

Defendant told Plaintiffs that they could not use their cellphone to contact anyone outside the Second Temple and that she would know if they attempted to do so. (Id. ¶ 53.) Defendant stayed in a room near Plaintiffs' living quarters and told Plaintiffs she could hear if they attempted to talk to or contact anyone. (Id.) Defendant would not allow Plaintiffs to leave the temple to seek medical attention, even when Doe 1 believed she had heat stroke from being forced to work without a fan during a heatwave. (Id. ¶ 54.) Within the Second Temple, Defendant controlled Plaintiffs' movements by refusing to let them walk around the courtyard and requiring them to be in their rooms after dark. (Id. ¶ 55.)

Defendant would blame Plaintiffs for things that went wrong at the temple even when it wasn't their fault, and made Doe 2 pay for plumbing repairs. (Id. ¶ 58.) When Plaintiffs were compensated for their ceremony work, Defendant would make deductions from the $100 they were promised because she was unhappy with aspects of the ceremony. (Id. ¶ 60.)

Defendant Lai would tell Roe to throw objects at Plaintiffs when Lai was angry with them. (Id. ¶ 65.) On at least one occasion, Roe threw a broom at Plaintiffs. (Id.) Defendant would punish Plaintiffs by making them kneel for almost an hour leaving Plaintiffs' knees sore, red, and swollen. (Id. ¶ 73.) Starting in May 2021, Plaintiffs were forced to pack up and move furniture and religious objects from the First Temple to the Second Temple. (Id. ¶ 87.)

On November 9, 2021, Defendant kicked Doe 2 out of the Second Temple and threw all her belongings into the parking lot. (Id. ¶ 95.) Doe 1 begged Defendant to let Doe 2 stay, but Defendant started yelling at both Plaintiffs. (Id. ¶ 96.) Doe 1 decided to leave with Doe 2 despite the risks. (Id.) Doe 1 called 911 for help and Plaintiffs managed to escape the Second Temple. (Id. ¶ 97.)

On December 20, 2022, Plaintiffs filed individual claims with the California Department of Relations Division of Labor Standards Enforcement ("DLSE"). (Id. ¶ 104.) On April 16, 2024, the Labor Commissioner exercised discretion to decline jurisdiction over the case. (Id. ¶ 107.)

## IV.   LEGAL STANDARD

### A.  Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "When a defendant moves to dismiss a complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving that the court has jurisdiction to decide the claim." Espino v. Regents of the Univ. of California, 666 F. Supp. 3d 1065, 1078 (C.D. Cal. 2023) (citing Thornhill Publ'n Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979)). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). A "district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014) (citing Pride v. Correa, 719 F.3d 1130, 1133 (9th Cir. 2013)).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone, 373 F.3d at 1039. In resolving a factual challenge, the court "need not presume the truthfulness of the plaintiff's allegations" and "may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment." White v. Lee, 227 F.3d 1214,

1242 (9th Cir. 2000).  "Where jurisdiction is intertwined with the merits, [the Court] must 'assume the truth of the allegations in the complaint . . . unless controverted by undisputed facts in the record.'"  <u>Warren v. Fox Fam. Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir. 2003) (quoting <u>Roberts v. Corrothers</u>, 812 F.2d 1173, 1177 (9th Cir. 1987)).

Where a suit lacks standing, the Court lacks subject matter jurisdiction and the suit should be dismissed.  <u>See</u> <u>Cetacean Cmty. v. Bush</u>, 386 F.3d 1169, 1174 (9th Cir. 2004).

## B.  Rule 12(b)(6)

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>see</u> <u>Ileto v. Glock Inc.</u>, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  <u>See</u> <u>Doe v. United States</u>, 419 F.3d 1058, 1062 (9th Cir. 2005); <u>ARC Ecology v. U.S. Dep't of Air Force</u>, 411 F.3d 1092, 1096 (9th Cir. 2005); <u>Moyo v. Gomez</u>, 32 F.3d 1382, 1384 (9th Cir. 1994).  Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  <u>In re Gilead Scis. Sec. Litig.</u>, 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  <u>Id.</u>

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  <u>Id.</u> at 570; <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 556).  The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).
//
//
//

## C. Rule 15

Rule 15 provides that leave to amend "shall be freely given when justice so requires."
Fed. R. Civ. P. 15(a). The Ninth Circuit has held that "'[t]his policy is to be applied with
extreme liberality.'" Eminence Cap., L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003)
(quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)).
Generally, a "district court should grant leave to amend even if no request to amend the pleading
was made, unless it determines that the pleading could not possibly be cured by allegation of
other facts." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citation omitted).

## V.    DISCUSSION

## A. Rule 12(b)(1)

Defendant argues that Plaintiffs' Complaint should be dismissed for lack of subject-
matter jurisdiction under the ministerial and ecclesiastical abstention doctrines. First, Defendant
contends that "[t]he ministerial exception bars employment-related claims brought by
individuals who perform religious functions for a religious organization." (Mot. at 6.) That is
plainly not the holding in either case cited by Defendant. Both Hosanna-Tabor Evangelical
Lutheran Church & Sch. v. E.E.O.C., 565 U.S. 171 (2012), and Our Lady of Guadalupe Sch. v.
Morrissey-Berru, 591 U.S. 732 (2020), address employment *discrimination* claims, not mere
"employment-related claims." The concept of the ministerial abstention doctrine does not mean
that religious institutions "enjoy a general immunity from secular laws, but it does protect their
autonomy with respect to internal management decisions that are essential to the institution's
central mission. And a component of this autonomy is the selection of the individuals who play
certain key roles." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 746 (2020).

Hosanna-Tabor and Our Lady of Guadalupe involved religious institutions' authority to
remove certain employees from their positions without the intervention of secular courts.
Plaintiffs' claims here do not raise similar issues. Plaintiffs do not contest their firing from a
position with a religious institution, thereby implicitly imposing the Court's scrutiny on an
internal decision regarding who Defendant employs as a religious minister. Nor does Defendant
cite any basis for her assertion that the ministerial abstention doctrine generally "prohibits courts
from regulating the terms, conditions, or compensation of religious service." (Mot. at 7.) There
is no basis for application of the ministerial abstention doctrine here.

Turning to the ecclesiastical abstention doctrine, the Free Exercise clause of the First
Amendment "prohibits courts from decid[ing] among competing interpretations of church
doctrine, or other matters of an essentially ecclesiastical nature." Elvig v. Calvin Presbyterian
Church, 375 F.3d 951, 956 (9th Cir. 2004) (internal citation omitted). Plaintiffs broadly refer to
their religious affiliation and their beliefs, but the crux of their wage claims is that they were
employees entitled to compensation and who were denied such compensation. Just because their
duties may have been influenced in some way by their faith does not mean they are not
employees. If construed as a facial challenge, the Court takes as true Plaintiffs' allegations, which

are that they were employees entitled to compensation.  If the Court instead construes this as a factual attack, whereby extrinsic evidence may be considered, the conclusion is no different.  Defendant's RJN attaches Plaintiffs' R-1 visa applications which characterize Plaintiffs' work as "new employment."  (See RJN.)  The applications go on to state that "Beneficiary has taken a vow of poverty, and therefore, receives no salary.  Will provide room and board, transportation, health insurance, and a monthly/annual stipend."  (Id.)  Such documentation does not undermine the allegation that Plaintiffs were employees of Defendant regardless of the compensation arrangement described by the preparer of the Form I-129.

At this stage there is simply no indication that matters of religious doctrine might need to be interpreted in order to adjudicate Plaintiffs' claims such that the ecclesiastical abstention doctrine applies.  After all, as the Ninth Circuit has held, "that the [religious institution's] conduct may have been motivated by religious convictions does not shield it from tort liability for injuries engendered by its actions."  Naoko Ohno v. Yuko Yasuma, 723 F.3d 984, 1011–12 (9th Cir. 2013).  Thus, even if religious principles may have had some underlying relationship to the conduct alleged, the Court may not be barred from considering the case so long as it is not adjudicating matters of religious doctrine.

## B.  Rule 12(b)(6)

Defendant raises several arguments for dismissal under Rule 12(b)(6).  First, Defendant contends that Plaintiffs' wage-and-hour claims are untimely and not subject to equitable tolling.  (Mot. at 3-5.)  Defendant argues that some of Plaintiffs' claims are subject to a three-year statute of limitations that began to run in 2021, and others are subject to a one-year statute of limitations.  (Mot. at 3.)  She acknowledges that Plaintiffs may allege equitable tolling based on the DLSE proceedings mentioned in the Complaint.  (Id.)

Courts are hesitant to adjudicate statute of limitations tolling issues in a Rule 12(b)(6) motion.  This is "[b]ecause the applicability of the equitable tolling doctrine often depends on matters outside the pleadings," so it "is not generally amenable to resolution on a Rule 12(b)(6) motion."  Supermail Cargo, Inc. v. United States, 68 F.3d 1204, 1206 (9th Cir. 1995) (quoting Cervantes v. City of San Diego, 5 F.3d 1273, 1276 (9th Cir.1993).  Because of this difficulty, "[a] motion to dismiss based on the running of the statute of limitations period may be granted only "if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled."  Id. at 1206-07 (quoting Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980)).  Plaintiffs' allegations on the face of the Complaint appear to support the finding that there may be a tolling argument.  They have pled the existence of the DLSE proceedings and that there is a relationship between Defendant and the First and Second Temples such that a proceeding against one of the temples might have provided necessary notice to Defendant Lai.  As such, at this stage, the Court does not dismiss the potentially facially time-barred allegations in the Complaint.

With respect to the sufficiency of other claims, Plaintiffs' allegations pass muster to state a claim upon which relief may be granted.  Defendant argues that Plaintiffs fail to plead an

employer relationship between Defendant and Plaintiffs. (Mot. at 5.) Plaintiffs' California labor code claims allege an employer-employee relationship by stating that Lai and the Second Temple were their employer. This is supported by Plaintiffs' allegations that Lai promised Plaintiffs compensation like room and board, along with money in exchange for performing ceremonies, yet later personally declined to provide such compensation, for example by reducing Plaintiffs' pay for each ceremony conducted. (See, e.g., Compl. ¶ 60.) While Plaintiffs' DLSE proceedings identified the Hong Shin Buddhist Center and not Defendant Lai, Plaintiffs repeatedly link the two throughout their Complaint. And the visa applications in Defendant's RJN show that Lai was the "Authorized Signatory" on their allegations, which suggests that she employed Plaintiffs. (See RJN.)

Defendant also contends that Plaintiffs fail to allege any specific workweek, hours worked, or minimum-wage shortfall for purposes of their minimum wage claim. (Mot. at 6.) Yet "[a] plaintiff may establish a plausible claim by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility." Landers v. Quality Commc'ns, Inc., 771 F.3d 638, 645 (9th Cir. 2014), as amended (Jan. 26, 2015). Plaintiffs allege their average workday was 12-17 hours every day of the week, and that they were paid between $100-200 per month. (Compl. ¶ 76.) As far as compensable work, Plaintiffs provide detailed descriptions of their daily cleaning and maintenance work, along with their cooking responsibilities. (Id. ¶¶ 78, 80-81.) This is sufficient to state a claim.

Defendant also raises issues with Plaintiffs' TVPA and Civil Code § 52.5 claims, but such allegations rest on false quotations to Ninth Circuit case law and misrepresent basic features of Plaintiffs' Complaint. As the Court has already identified, Defendant's attributions to Headley are not entirely the law. But even taking Headley for what it actually says—that the plaintiffs in that case failed to state a claim for forced labor because they had many opportunities to leave their religious organization—Plaintiffs' allegations are far different. Under 18 U.S.C. § 1595A, a victim of a violation of the TVPA may bring a civil action based on the criminal statute. The criminal statute prohibits:

> [K]nowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means—
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a).

In <u>Headley</u>, the Court ruled against the plaintiffs because they lived outside of their religious institution and had access to vehicles, phones, and the Internet. <u>Headley</u>, 687 F.3d at 1180-81. They also frequently traveled away from their religious organization as far as across the country and internationally. <u>Id.</u> There is no suggestion in <u>Headley</u> that either plaintiff had an uncertain or job-related immigration status. <u>Id.</u> Thus, they had failed to show any restraint on their ability to leave. Here, by contrast, Plaintiffs have alleged that they were not allowed to leave the Second Temple without permission; that the temple was surrounded by walls and a locked gate; that they were surveilled; and that Defendant told them that if they ever left the Second Temple without permission, they would lose their legal status and be deported. (Compl. ¶¶ 50-52.) Plaintiffs also allege that they were physically attacked and threatened. (<u>Id.</u> ¶¶ 65, 73.)

Plaintiffs' circumstances as pled, and which the Court takes as true, demonstrate all of the force, coercion, and threats that were not present in <u>Headley</u>. Plaintiffs also plead abuse of the legal process by Defendant's alleged control over their immigration documentation and use of Plaintiffs' precarious immigration status to control their movement and actions. Defendant may *disagree* with Plaintiffs' allegations, but it is plainly false to state that "Plaintiffs do not allege that any Defendant physically restrained them, threatened unlawful harm, or compelled continued service through force or threats" and that "[t]hey do not allege that they attempted to leave and were prevented from doing so, that their movement was restricted, or that Defendants used legal process in response to an attempt to depart." (Mot. at 9.) That is precisely, in *great detail*, what Plaintiffs allege.

Plaintiffs have sufficiently stated claims upon which relief may be granted. As such, Defendant's Motion is **DENIED** in its entirety.

## VI.    CONCLUSION

For the reasons above, the Court **DENIES** Defendant's Motion. The February 23, 2026, hearing is **VACATED**. Defendant's Counsel must comply with the orders stated above relating to sanctions.

**IT IS SO ORDERED.**